(97 South. 911)

**WILLIAMS v. WILSON et al.** (8 Div. 508.)

(Supreme Court of Alabama. Nov. 8, 1923.)

**1. Bastards ⬤⟳3 — Presumption of legitimacy held to obtain.**

Where a woman who had lived with one man as his wife, on disappearance of such man, married another and continued to live with him for 20 years, a child born during such time will be presumed to be legitimate.

**2. Evidence ⬤⟳54 — Conclusion from evidence may be used as premise in passing on other evidence.**

When trier of fact has reached a fair conclusion on one phase of the evidence, this conclusion may be used as a premise in passing on other evidence.

**3. Evidence ⬤⟳54—One presumption cannot be based on another.**

One presumption cannot be based wholly on another.

**4. Evidence ⬤⟳53—Presumption should be natural inference.**

A presumption should be a natural inference from the facts of the case.

**5. Evidence ⬤⟳60—Person not presumed immoral.**

A person will not be presumed to have done that which is immoral.

**6. Evidence ⬤⟳60—Presumption of innocence obtains.**

The presumption of innocence obtains in civil as well as in criminal cases.

**7. Marriage ⬤⟳40(9)—Man and woman who lived together presumed lawfully married.**

Where a woman lived with one man as his wife, and several years after his failure to appear, at the close of the Civil War in which he had participated, she married another man and for 20 years continued to live with him as his wife, and on return of the first man left the second man and resumed cohabitation with the first man, but subsequently returned to the second man under circumstances justifying her in supposing that her marriage with him was valid, she will be presumed to have been lawfully married to the first man, notwithstanding such return to the second man; there being no presumption in such case that her relations with the first man were unlawful, or that she had been divorced from him, making subsequent relations with him unlawful.

Appeal from Circuit Court, Franklin County; Chas. P. Almon, Judge.

Bill of Charlie Williams against James E. Wilson and others. From a decree denying relief, complainant appeals. Affirmed.

William L. Chenault and J. Foy Guin, both of Russellville, for appellant.

When the relation of father and child is once established, the law presumes legitimacy. The burden of proof is upon those who deny it. Lay v. Fuller, 178 Ala. 375, 59 South. 609; Weatherford v. Weatherford, 20 Ala. 548, 56 Am. Dec. 206. The presumption of actual marriage from the fact of continued cohabitation is rebutted by the fact of a subsequent permanent relation. 18 R. C. L. 416; 26 Cyc. 880; 14 L. R. A. 543; Bell v. Bell, 196 Ala. 465, 71 South. 465; McLaughlin v. McLaughlin, 201 Ala. 482, 78 South. 388; Code 1907, § 5199.

Kirk & Rather, of Tuscumbia, for appellees.

In this state marriage may be contracted without ceremony or solemnization, by the consent of the parties, followed by cohabitation. Herd v. Herd, 194 Ala. 613, 69 South. 885, L. R. A. 1916B, 1243; Farley v. Farley, 94 Ala. 501, 10 South. 646, 33 Am. St. Rep. 141; Campbell's Adm'r v. Gullatt, 43 Ala. 57; Riley v. Bell, 89 Ala. 597, 7 South. 155; Tartt v. Negus, 127 Ala. 301, 28 South. 715; Moore v. Heineke, 119 Ala. 627, 24 South. 374. A marriage thereafter, without dissolution of the first, is void. Martin's Heirs v. Martin, 22 Ala. 86; Darrow v. Darrow, 201 Ala. 477, 78 South. 383; Smith v. State, 92 Ala. 69, 9 South. 622; Carter v. Gaines, 204 Ala. 640, 87 South. 109; Washington v. Washington, 69 Ala. 281; Stewart v. Vandervort, 34 W. Va. 524, 12 S. E. 736, 12 L. R. A. 50; 26 Cyc. 848; McLaughlin v. McLaughlin, 201 Ala. 482, 78 South. 388.

BOULDIN, J. The suit is for redemption of lands from mortgage foreclosure sale.

---

⬤⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The equities of the bill were settled on former appeal from decree on demurrer. Williams v. Wilson, 205 Ala. 119, 87 South. 549. The court below dismissed the bill on the merits; hence this appeal.

Both parties claim through one Mac Smith, the common source of title.

Complainant, Charlie Williams, claims by descent, and respondents, James E. Wilson and others, by purchase at foreclosure sale under mortgage.

Respondents deny that Charlie Williams is a legitimate descendant and heir of Mac Smith, deceased. His legitimacy, vel non, is the controlling question in the case.

On this issue the record discloses the following interesting history: Some time before the Civil War, a family of the name of Gray moved into and settled in Franklin county. In this family was a daughter, Rachael Allard Gray. A young man, Jack Adkinson, came with the Gray family. Shortly before the war, Jack Adkinson and Rachael Gray were living together on the Bonds place as husband and wife. They held themselves out and were generally reputed and received in the neighborhood as such. To them were born two children who died in infancy and were buried in the neighborhood under the name of Adkinson. There was no record evidence, and no evidence of a public ceremonial marriage. All direct evidence of above facts is from witnesses testifying from childhood memories about events some 60 years past. Other evidence is of general repute, some of which was current some 30 years thereafter. On an issue of legitimacy, raised after so long a time, we would seriously question the sufficiency of this testimony, standing alone, to establish the lawful relation of husband and wife between Jack Adkinson and Rachael Gray, when followed by a breaking off and abandonment of the relation and subsequent marriage of one or both of the parties.

The history proceeds: Some time during the war Jack Adkinson moved his family in the yard of the home of Mr. Bonds, raised a company, became its captain, and entered the Confederate Army. It appears he visited home a time or two during the war. When the war was over he did not return; he was not heard from; he was generally reputed to be dead; Rachael returned to her old home, and was generally known as the widow of Adkinson. Two or three years after the surrender, Rachael married Mac Smith. They founded their own home. To them were born three children. The youngest died when a child. The two oldest, Alice Smith and Monroe Smith, were twins. Alice married Bill Williams, and became the mother of complainant, Charlie Williams.

[1] While there is no record evidence of the marriage of Rachael to Mac Smith, the courthouse having been burned, we think this record sufficiently shows that it was an open, public marriage, celebrated in the usual way. This family relation continued without interruption for about 20 years. Alice Smith, the issue of this marriage, was then about grown. At that point in their history, all the presumptions of her legitimacy obtained. Weatherford v. Weatherford, 20 Ala. 548, 56 Am. Dec. 206; Lay v. Fuller, 178 Ala. 375, 59 South. 609; Moore v. Heineke, 119 Ala. 627, 24 South. 374; McLaughlin v. McLaughlin, 201 Ala. 482, 78 South. 388; Bell v. Bell, 196 Ala. 465, 71 South. 465; Prince v. Edwards, 175 Ala. 532, 57 South. 714; 26 Cyc. 880.

About the year 1890, Jack Adkinson, Rachael's long absent husband, returned. He came to the home of her brother, Jim Gray. Word was sent to Rachael, who promptly left her home, husband, and children, and went to Adkinson. They resumed the relations of husband and wife. They so lived under the roof of her brother, who had full knowledge of the original relations between them. It was generally known and talked in the community that Rachael had gone back to her husband Adkinson. It was known to Mac Smith, who took no action. They then moved to themselves, lived in Florence for a time, and then returned to the home of Jim Gray.

After thus living in their renewed relation of husband and wife for a few months, the exact time not certain, Rachael one day left Adkinson, returned to her home and children, was received by Mac Smith; the family relation was resumed, and they continued to live together as husband and wife until Mac Smith's death some 8 or 10 years thereafter. Adkinson remained in the neighborhood a few months, then went away. Monroe Smith, complainant's uncle, testified he saw Adkinson "just a while" before his father (Mac Smith) died.

Jim Gray, Mac Smith, and Rachael Gray-Adkinson-Smith are all dead. The record is silent as to any divorce on behalf of either of the parties.

The facts of the return of Rachael to the embraces of Jack Adkinson and her subsequent return to Mac Smith, as above, are admitted on both sides.

On this state of the facts, what are the presumptions and just inferences as to whether Rachael and Mac Smith were ever lawfully married?

Appellant's argument is well summarized in brief of counsel thus:

"The complainant's attorney is of the opinion that the law is that presumptively the first union was illegal, and further that if same were legal the presumption of law is that Rachael was divorced from Adkinson, or Adkinson from Rachael: that the duty rested on the defendants attacking the complainant's legitimacy to show a ceremonial marriage with Adkinson, and further to show the absence of a decree of divorce."

All these presumptions have been indulged in some cases as shown by above authorities. Do they operate here?

"A presumption of fact is that mental process by which the existence of one fact is inferred from proof of some other fact or facts with which experience shows it is usually associated by succession or coexistence. It is inseparable from inductive reasoning as an inference of the unknown from proof of the known." 22 C. J. p. 83, § 26, and note.

"These merely natural presumptions are derived wholly and directly from the circumstances of the particular case, by means of the common experience of mankind." 1 Greenl. on Ev. (16th Ed.) p. 144, § 44.

"Presumptions which may properly be made, are only justifiable, where they are the natural, or necessary consequence of the acts proved." Garner v. Green, 8 Ala. 96, 98.

[2, 3] When, in the reasoning process, the trior of fact has reached a fair conclusion on one phase of the evidence, this conclusion may be used as a premise in passing upon other evidence; but one presumption cannot be based wholly on another presumption. 22 C. J. p. 84, § 27, and note.

[4-6] In raising presumption, certain principles of justice and fair dealing among men must always obtain in the judicial mind. It should be a natural inference from the facts of the case. It should ascribe to human conduct the quality and motive of normal men and women, unless otherwise shown. In this connection, the law thinks no evil. It does not impute fraud, It does not hold that immoral which is equally consistent with moral conduct. The presumption of innocence obtains in civil as in criminal cases. Freeman v. Blount, 172 Ala. 655, 55 South. 293.

In finding whether there was a lawful marriage between Rachael and Mac Smith in this case, much centers about Rachael's return to Adkinson. She knew at that time whether she was ever lawfully married to Adkinson. She also knew whether she had ever obtained a divorce dissolving that union, if lawful. Are we to assume that Rachael, far advanced in life, left her husband, her home, and her children, to resume an old illicit relation with a man who had abandoned her more than 20 years before? This would mean to break the bonds of a lawful marriage with Mac Smith, to abandon and disgrace her own children, and to flaunt her shame in the face of the community and under the roof of her brother.

If she had, on her part, obtained a divorce from Adkinson in order to enter into a lawful marriage with Smith, can we assume that Rachael, who, on this assumption, had never lived in illicit relations with either, now, for the first time, engaged in such unwonted and wanton conduct?

Again, if we presume that Adkinson had obtained a divorce, or claimed to have done so, and Rachael went to him on such belief, we face the same criticism of her conduct.

Looking at it from Adkinson's viewpoint, if we presume he had obtained a divorce from Rachael, and himself remarried, can we assume that he returned after all these years, and entered into unlawful relations with Rachael which had never existed before? This would be to presume that Adkinson, whose marriage relations had always been lawful, came back to break up a lawful union between the wife, whom he had abandoned and divorced, and her present lawful husband.

[7] We cannot indulge such presumptions. It is fairer to all parties, including Charlie Williams himself, to hold Rachael, his grandmother, guilty of no such conduct. Her return to Adkinson reflects a backward light on their original relations. We are convinced, with aid of this evidence, that Rachael and Adkinson were lawfully married in their youth.

We see no reason to find that it was merely a common-law marriage.

When it affirmatively appears that the relation between the parties had its beginning in illicit cohabitation, there is reason to hold that this state continued until there is evidence that it was converted into the lawful relation of husband and wife.

Rachael and Adkinson formed their union in their youth, when there was no obstacle to marriage, and under no circumstances of suspicion under this record. We prefer to find in such case that the marriage was entered into in the usual manner sanctioned by law and the social customs of the community where they continued to live.

We think further that when Adkinson failed to return after the war was over, was not even heard from for some years, was reputed to have died in the hazardous service of war, Rachael, believing him dead, married Mac Smith in good faith. She lived more than 20 years in this belief. She knew no reason for asking a divorce from her lost husband.

Then Adkinson suddenly appeared. Rachael found herself in the unhappy position of having married with a former husband living. She could not have two lawful husbands. She knew which was her lawful husband and went to him. In all justice and charity we must conclude she went to Adkinson out of sense of legal duty. A legal obstacle, not of her choosing, forbade her remaining with Mac Smith. Every natural impulse and affection impelled her to stay in her home and with her family, and this record discloses no facts on which we should hold that she went to Adkinson for other cause than the unhappy alternative which now confronted her.

But what of Rachael's leaving Adkinson and returning to Smith? However viewed,

this fact cannot break the probative force of the facts above discussed. There is no claim that either party obtained a divorce thereafter, and the conditions would repel such presumption. We are not warranted in finding that Adkinson died pending the restored union of Rachael and Mac Smith, so that a lawful marriage could arise after the legal obstacle was removed.

However, it is proper to call attention to some inferences touching Rachael's going back home.

It appears reasonably that pending her residence with Adkinson at the home of her brother, Jim Gray, a criminal prosecution was begun against Mac Smith, probably backed by Jim Gray. Rachael, whether willingly or under pressure we are not advised, was summoned as a witness. The question arose as to her competency to testify against Mac Smith. The testimony leaves in fair inference that an eminent jurist interposed and advised against the indictment of Mac Smith on her testimony because of the relation of husband and wife. The prosecution failed. We may easily infer this opinion of the judge reached Rachael, and acting thereon, she went back where home and children called her. This was a natural thing to do, and does not lessen the probative force of the facts showing she was really the lawful wife of Jack Adkinson.

It results that Charlie Williams could not lawfully inherit the lands in suit.

The decree of the court below is affirmed. Affirmed.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.